**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| **RAY A. ARDITI,** | : | |
| *Plaintiff,* | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **POLICE OFFICER RICHARD SUBERS,** | : | **No. 15-5511** |
| **et al.,** | : | |
| *Defendants.* | : | |

**MEMORANDUM**

PRATTER, J.                                                    OCTOBER 25, 2016

Ray Arditi filed suit against police officers from three municipalities, alleging that his constitutional rights were violated when he was handcuffed and searched in a McDonald's parking lot and later received a citation for disorderly conduct. The Defendants have filed three motions for summary judgment, arguing that the undisputed facts show that they did not violate Mr. Arditi's rights and that, in any event, they are entitled to qualified immunity. The Court heard oral argument on the motions. Because there are genuine disputes of material facts with respect to at least some of the claims, the Court will grant in part and deny in part each of the motions.

**BACKGROUND**

While Ray Arditi was eating at a McDonald's restaurant on May 31, 2015, he told an acquaintance, Dakota Page, that another individual in the restaurant, Catherine Herbert, stole his wallet at some point in the past, and that Ms. Herbert and another patron, Paul Mick, had attempted to use Mr. Arditi's credit cards to make online purchases. Ms. Herbert overheard this conversation and became agitated, threatening suicide. Mr. Arditi testified that Ms. Herbert also

1

called 911.  And, indeed, someone at the McDonald's restaurant did call 911 and reported that a fight had broken out.  Officers from three municipalities were dispatched to the scene.  While they were on their way to the McDonald's, a dispatch operator clarified for the officers that the fight was a verbal altercation, rather than a physical one.

When Mr. Arditi finished eating, he left the restaurant to walk to his car.  As he stood in the parking lot, he saw multiple police cars pull in to the lot.  He states that several officers then got out of their cars and immediately approached him, demanding that he identify himself and screaming orders and threats.[1]  Mr. Arditi admits that he answered the officers' demands with questions of his own rather than by identifying himself.  However, according to Mr. Arditi's account, he did not physically resist the officers at any time.  Officer Clymer of the Brookhaven Police Department then handcuffed Mr. Arditi, and Officer Naegele of Upland assisted by holding one of Mr. Arditi's arms.[2]  Meanwhile, Officer Young of Parkside pointed a taser at Mr. Arditi and screamed that he was resisting and was a terrorist.  After Mr. Arditi was handcuffed, he informed the officers that his identification was in the trunk of his car.  Mr. Arditi told the officers that his car keys were in his pocket, and Officer Clymer retrieved Mr. Arditi's car keys from his pocket and searched his car to get the identification.  Mr. Arditi was then released without being charged.

---

[1] The officers' testimony differs from Mr. Arditi's significantly with respect to most of the encounter. Because the Court must view the evidence in the light most favorable to Mr. Arditi, as the non-moving party, his account will be used to the extent that it contradicts the testimony of the officers.

[2] Mr. Arditi testified in his deposition that Officer Subers handcuffed him, but this assertion was based only on the fact that Officer Subers was the officer who eventually issued a citation, not on any positive identification.  He also claims that no officers went into the McDonald's to investigate, but the officers testify that Officer Subers did so.  Because Mr. Arditi's testimony, uncorroborated by anyone inside the McDonald's, at most reveals that he did not personally observe any officer enter the McDonald's, it does not directly contradict the officers' testimony that Officer Subers entered the McDonald's and conducted an investigation.

At no time during this encounter did Mr. Arditi tell any of the officers that the handcuffs were uncomfortable, although Mr. Arditi testified at his deposition that the handcuffs felt like knives digging into his wrists.  Mr. Arditi submitted pictures of his wrists, taken shortly after the incident, showing marks.  He went to the emergency room for treatment of his wrists the afternoon of the incident and saw his doctor a few days later, by which time there were no visible injuries.  At that doctor visit, no treatment was given.  He claims that his wrist injuries are ongoing, but it is unclear from the limited medical records he submitted whether his ongoing wrist and thumb complaints actually stem from this incident.[3]

The next day, Mr. Arditi went to the police department to complain about his treatment. There, he spoke with Chief McGoldrick, who denied him access to a police report and threatened to issue a criminal summons because of his complaints.  Unbeknownst to Mr. Arditi, Officer Subers had already written in his notes at the end of Officer Subers's shift on May 31, 2015 that he was planning to issue a disorderly conduct citation to both Mr. Arditi and Ms. Herbert.  He then issued both Mr. Arditi and Ms. Herbert citations on his next shift, which did not overlap with Chief McGoldrick's shift.  Both Officer Subers and Chief McGoldrick testified that Officer Subers did not need the Chief's approval to issue a citation for disorderly conduct.  There is no evidence in the record that Officer Subers and Chief McGoldrick communicated with each other about bringing any charges.  The charges against Mr. Arditi were later dismissed, however, when the police officers failed to appear at a hearing on the charges.

---

[3] There are treatment records from May and June of 2016, and the handcuffing is described in those records.  The records also mention chiropractic care relating to wrist and thumb pain.  None of the records expressly link the injuries directly to the handcuffing.  On the one hand, the records do recount Mr. Arditi's mention of that incident.  On the other, the records note increasing pain in the few months before the appointments, which is well after the incident.  At the time the summary judgment motions were filed, no medical or other expert opinion testimony had been submitted linking his current wrist issues with the handcuffing.

Mr. Arditi then filed this suit.  After initial motion practice and amendments to the original complaint, the following claims remain.  In Count One of Mr. Arditi's Third Amended Complaint, Mr. Arditi claims under 42 U.S.C. § 1983 that all defendants except Chief McGoldrick[4] violated his Fourth and Fourteenth Amendment rights by illegally searching his car and seizing him.  In Count Two, he claims under § 1983 that all defendants except Chief McGoldrick violated his Fourth and Fourteenth Amendment rights by using excessive force against him.  In Count Three, he claims that Defendants Subers and McGoldrick maliciously prosecuted him in violation of Pennsylvania state law.  In Count Four, Mr. Arditi claims Defendants Subers and McGoldrick violated § 1983 when they conspired to maliciously prosecute him.

There are three pending motions for summary judgment, one filed by the officer or officers from each municipality.  Mr. Arditi opposes all three motions.

## LEGAL STANDARD

Summary judgment is appropriate only when the record fails to demonstrate a genuine dispute as to material fact that would permit a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250 (1986); *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159 (3d Cir. 2003) ("The movant's burden on a summary judgment motion in an antitrust case is no different than in any other case.").  "The moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry the burden of persuasion at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The nonmoving party must point to evidence – beyond the pleadings – showing that a genuine dispute as to an issue of material fact exists, necessitating at trial.  *Id* at 324.  "On summary

---

[4] Mr. Arditi initially included Chief McGoldrick in Counts I and II, but the Court dismissed those claims as to Chief McGoldrick.

judgment, the moving party need not disprove the opposing party's claim, but does have the burden to show the absence of any genuine issues of material fact." *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996) (citing *Celotex*, 477 U.S. at 322–23).

## DISCUSSION

### A. Officers Clymer and Subers and Chief McGoldrick (the Brookhaven Defendants)

#### 1. Counts I and II: Excessive Force and Unlawful Search and Seizure

In Counts I and II of his Third Amended Complaint, Mr. Arditi claims that the officers he encountered in the McDonald's parking lot, including Officers Clymer and Subers, used excessive force and subjected him to an unlawful search and seizure in violation of the Fourth Amendment. In order to make out a *prima facie* case against an individual under § 1983, a plaintiff must show (1) that this person deprived him or her of a federal right; and (2) that in doing so, this person was acting under color of state or territorial law. *Edwards v. City of Philadelphia,* 860 F.2d 568, 573 (3d Cir.1988) (citing *Gomez v. Toledo,* 446 U.S. 635, 640 (1980)). The Defendants do not dispute that they were acting under color of state law when they encountered Mr. Arditi, so the Court's discussion will focus on whether any of the officers deprived Mr. Arditi of any federal right.

As an initial matter, Officer Subers argues that he was not even present for the handcuffing or search of Mr. Arditi's car, and therefore he cannot be held liable for any alleged violations related to those incidents. Mr. Arditi counters by arguing that no officers went into the McDonald's. However, the most that Mr. Arditi can state is that he did not observe any officer go into McDonald's. This does not directly contradict Officer Subers's testimony – and the testimony of the other officers – that Officer Subers did go into the McDonald's and did

interview witnesses.  Mr. Arditi does not offer testimony from anyone who was in or around the McDonald's at the time and who would have had an opportunity to observe what occurred inside the McDonald's while Mr. Arditi was outside with the other officers.  Because, even viewing the facts in the light most favorable to Mr. Arditi, there is no evidence that Officer Subers played any role in handcuffing Mr. Arditi or searching his car, but rather was inside the McDonald's while Mr. Arditi encountered the other officers, the Court will grant the Brookhaven Defendants' motion as to Counts I and II as they relate to Officer Subers.

Officer Clymer, on the other hand, admits that he handcuffed Mr. Arditi and retrieved Mr. Arditi's identification from the trunk of his car.  Officer Clymer argues that he did not handcuff Mr. Arditi too tightly, that he acted reasonably in cuffing Mr. Arditi when he refused to identify himself, that there was probable cause to arrest Mr. Arditi, and that Mr. Arditi consented to the limited search of his vehicle.  Officer Clymer argues that Mr. Arditi was not under any duress, other than "self-imposed" duress resulting from not cooperating and identifying himself. The Court will address the encounter between Officer Clymer and Mr. Arditi in three parts, examining the seizure, search, and excessive force aspects of Mr. Arditi's claims in turn.

### a.  Illegal Seizure

No one argues that the officers could not approach Mr. Arditi and ask him questions in the course of their response to the 911 call.  The controversy begins with handcuffing.  The parties agree that the handcuffing was a seizure and that probable cause, or, at the very least, reasonable suspicion, was needed to justify the handcuffing.[5]

---

[5] Of the three motions, only the Brookhaven Defendants' motion provided any real discussion of the handcuffing as a potentially unlawful seizure, and they argued that probable cause was present because Mr. Arditi was identified by the McDonald's manager as being part of a verbal altercation, giving the officers probable cause to believe Mr. Arditi had engaged in disorderly conduct.  None of the parties squarely address whether probable cause or reasonable suspicion was required in order to handcuff Mr.

For Fourth Amendment purposes, a seizure occurs both when police make an investigatory stop, *see Terry v. Ohio,* 392 U.S. 1, 16 (1968) ("It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person."), and when police arrest someone.  To justify the former, an officer must have reasonable suspicion of criminal activity.  *Id.* at 21.  To determine whether an officer has reasonable suspicion to make an investigatory, or *Terry*, stop, courts must analyze the "totality of the circumstances" surrounding the stop.  *United States v. Sokolow,* 490 U.S. 1, 7 (1989) (quoting *United States v. Cortez,* 449 U.S. 411, 417 (1981)).  To establish reasonable suspicion, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the seizure]." *Terry,* 392 U.S. at 21.  Reasonable suspicion is a less demanding standard than probable cause, yet it does require more than an officer's mere suspicions or hunches.  *Sokolow,* 490 U.S. at 7.

On the other hand, an arrest requires probable cause.  "Probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested."  *Merkle v. Upper Dublin Sch. Dist.,* 211 F.3d 782, 788 (3d Cir. 2000) (citing *Orsatti v. New Jersey State Police,* 71 F.3d 480, 482 (3d Cir.1995)).  Thus, "the probable cause standard does not turn on the actual guilt or innocence of the arrestee, but rather, whether the arresting officer reasonably believed that the arrestee had committed the crime." *Radich v. Goode,* 886 F.2d 1391, 1397 (3d Cir. 1989).

The Court need not decide here whether the seizure of Mr. Arditi was an investigatory stop or an arrest because Officer Clymer cannot yet satisfy either standard.  The officers testify

---

Arditi, but neither do any of the parties dispute that a seizure occurred when Mr. Arditi was handcuffed (nor could they efficaciously dispute that).

that when they arrived at the McDonald's, before the officers confronted Mr. Arditi, the manager pointed out Mr. Arditi as being involved in the altercation.  Mr. Arditi says the officers just rolled up and swarmed him without doing any investigation whatsoever and that the manager was not outside the McDonald's when the officers arrived.  Moreover, while the Court finds that the record supports that Officer Subers did go into the McDonald's to investigate, no one contends that Officer Clymer knew any results of that investigation when he handcuffed Mr. Arditi.  Thus, viewing the facts in the light most favorable to Mr. Arditi as the non-moving party, the information the officers had when they handcuffed Mr. Arditi was that Mr. Arditi did not immediately identify himself when approached in the parking lot of McDonald's and that there was a report of a verbal altercation between unknown parties at McDonald's.  Based on these two facts alone, there was no reason at that time immediately before the handcuffing to suspect that Mr. Arditi committed or planned to commit any crime.  Thus, even assuming that the less-exacting reasonable suspicion standard applies, the genuine dispute of material fact regarding what Officer Clymer knew when he handcuffed Mr. Arditi prevents the Court from granting summary judgment.

Officer Clymer argues that even if Mr. Arditi's rights were violated, Officer Clymer is entitled to qualified immunity.  Under the qualified immunity doctrine, law enforcement officers acting within their professional capacity are immune from suit "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Wilson v. Layne,* 526 U.S. 603, 614 (1999) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)).  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz,* 533 U.S. 194, 202 (2001).  This

inquiry "must be undertaken in light of the specific context of the case." *Id.* at 201. "Therefore, to decide whether a right was clearly established, a court must consider the state of the existing law at the time of the alleged violation and the circumstances confronting the officer to determine whether a reasonable state actor could have believed his conduct was lawful." *Kelly v. Borough of Carlisle,* 622 F.3d 248, 253 (3d Cir. 2010).

Officer Clymer bases his qualified immunity argument on an assumption that it is undisputed that the McDonald's manager identified Mr. Arditi as a participant in the disturbance in McDonald's, giving Officer Clymer reason to suspect Mr. Arditi of criminal activity. However, as already noted, that basic fact is at this time in dispute. It would have been clear to any officer that an individual's Fourth Amendment rights are violated if an officer handcuffs that person in the course of investigating a minor and non-violent crime, without any basis to suspect that the individual had participated in the crime. Therefore, Officer Clymer is not yet entitled to qualified immunity, and the Court will deny the Brookhaven Defendants' motion for summary judgment as to the alleged illegal seizure claim against Officer Clymer.

### b. Excessive Force

Mr. Arditi also claims that Officer Clymer used excessive force when he handcuffed him. *Kopec v. Tate*, 361 F.3d 772 (3d Cir. 2004), is the leading case in this circuit on what constitutes excessive force in the handcuffing context. In that case, after the plaintiff refused to identify himself and an officer arrested him for disorderly conduct and applied handcuffs, the plaintiff began losing feeling in one of his hands within ten seconds of being handcuffed, asked the arresting officer repeatedly to loosen them, and eventually began to faint from the pain and fell to the ground. *Id.* at 774. The officer ignored the plaintiff's groans and complaints for ten minutes before loosening the handcuffs. *Id.* The plaintiff claimed permanent nerve damage for

9

which a hand surgeon had treated him for over a year. *Id.* Under those facts, the plaintiff was allowed to proceed on his excessive force claim. The *Kopec* court, recognizing the potential for "open[ing] the floodgates to a torrent of handcuff claims," cautioned that the opinion should not be overused. *Id.* at 777.

After *Kopec*, courts addressing handcuff claims focus on the officer's awareness that the handcuffs are unreasonably tight, putting an emphasis on whether there are "obvious visible indicators of pain;" on the permanence and extent of any injury; and on the circumstances surrounding the handcuffing (*e.g.,* the dangerousness of the suspect and/or situation, seriousness of the crime committed, etc.). *See, e.g., Gilles v. Davis*, 427 F.3d 197 (3d Cir. 2005) (upholding grant of summary judgment on handcuffing claim when the plaintiff made a few complaints about the tightness of the handcuffs but showed no signs of discomfort and failed to seek medical treatment after the fact); *Fry v. Smoker*, Civil Action No. 11-3015, 2012 WL 1622656 (E.D. Pa. May 9, 2012) (denying summary judgment when plaintiff showed "substantial evidence of serious injuries"). Here, only the third factor clearly weighs in Mr. Arditi's favor – drawing inferences in Mr. Arditi's favor, the crime at issue was minor and non-violent, Mr. Arditi did not threaten or resist the officers or wield a weapon, he was vastly outnumbered, and the officers may not have even had reason to suspect he was involved in the minor, non-violent crime they were investigating.

The first two factors, however, are not so favorable to Mr. Arditi. Mr. Arditi testified that "the handcuffs felt like knives digging in his wrists" and that the officers were screaming at him throughout the time he was handcuffed. But evidence about how the handcuffs felt to him does not necessarily mean that the pain was on display to the officers, especially given the relatively short period of time during which he was cuffed and his admitted failure to complain. Nothing

else in the record shows that Mr. Arditi's pain was obvious to anyone else generally or Officer Clymer specifically.

With respect to injury, Mr. Arditi submits pictures of his wrists that show indentations consistent with tight handcuffs. The summary judgment record also includes medical records relating to his wrists. The first comes from the Riddle Hospital emergency room, and it shows that Mr. Arditi went there on the date of the incident with "mild" injuries, that he had pain, swelling, and red marks on his wrists (although other portions of the same document state that there was no pain or redness), and that he was discharged with instructions to follow up with his doctor. Mr. Arditi then saw his doctor a few days later, by which time the marks were completely gone, and no wrist treatment was given. The summary judgment record is then silent on the issue for nearly a year. The next medical records submitted come from doctors who examined Mr. Arditi on the one-year anniversary of the incident and again a few months later. These records show that Mr. Arditi had pain in his right wrist and left thumb, which had increased in the few months before the doctor's visit and was treated with injections, that Mr. Arditi reported seeing a chiropractor, and that Mr. Arditi connected the injury to the handcuffing a year earlier. Importantly, aside from Mr. Arditi's own opinion about the origin of this pain, nothing in the recent medical records links his recent wrist complaints to the handcuffing incident. At oral argument, the parties alluded to a late-produced expert opinion on the issue, but that report was never submitted as part of the summary judgment record in the case. Thus, at most, Mr. Arditi has shown that the handcuffs made marks on his wrists, that he went to the emergency room and his own doctor shortly after the incident but received no treatment, and that a year later he was suffering from some wrist pain with no established connection to the handcuffing incident.

Mr. Arditi relies on *Fry*, 2012 WL 1622656, to argue that a jury should decide whether the handcuffing here constituted excessive force.  *Fry* involved suspicions of a more serious crime than the one at issue here, but a similarly short period of handcuffing, a lack of complaints by the plaintiff about the tightness of the handcuffs, and circumstances under which the officer involved did not face any threat of violence.  *Id.*  In *Fry*, however, the plaintiff had a well-documented wrist injury that required a splint, several doctor visits over the course of six months, and, eventually, surgery, as well as an expert report from his doctor linking at least some of his wrist injuries directly to the handcuffing.  It was this "substantial evidence of serious injuries" that led to the court's conclusion that summary judgment was inappropriate.  *Id.* at *7.

Although, as the Court has already held, a jury will have to determine whether Mr. Arditi should have been subject to seizure and handcuffing at all, Mr. Arditi has not provided sufficient evidence of excessive force with respect to the handcuffing.  Unlike in *Fry*, Mr. Arditi has not produced any evidence of long-lasting or permanent injuries resulting from the handcuffing, and his visits to the emergency room and doctor in the immediate aftermath show only that he had some swelling that resolved within a few days at most and did not require treatment.  This case, therefore, is much more akin to *Gilles*, a case in which the plaintiff, after being handcuffed for disorderly conduct, showed no outward signs of pain while handcuffed and did not receive medical treatment, than it is to *Fry*.  Therefore, the Court will grant the Brookhaven Defendants' motion as to the excessive force claim.

### c.  Illegal Search

Defendants argue that Mr. Arditi consented to the search of his car, and that to the extent he claims he was under duress, that duress was all of his own creation because he failed to answer questions and resisted their attempts to handcuff him.  Having found that there was

arguably an illegal seizure of Mr. Arditi, however, any duress cannot fairly be attributed to Mr. Arditi's behavior.  While merely handcuffing someone and pointing a weapon at them during a struggle to get a subject under control would not be enough to invalidate consent to search, here the officers arguably did not have probable cause or even reasonable suspicion to handcuff Mr. Arditi in the first instance.

None of the parties briefed the issue of the effect of an illegal seizure on later consent.  At most, Mr. Arditi suggested that this may be an issue in this case, but he did not cite case law directly on point.  "To determine if an impermissible seizure under the Fourth Amendment taints later consent, we look to: '[t]he temporal proximity of the [impermissible conduct] and the [consent], the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct.'"  *United States v. Luna*, 76 Fed. App'x. 411, 414 (3d Cir. 2003) (quoting *Brown v. Illinois,* 422 U.S. 590, 603-04 (1975)).  Here, there were no breaks or intervening circumstances between the potentially unlawful seizure and Mr. Arditi's consent to search.  Thus, the Court cannot grant summary judgment to Officer Clymer on the unlawful search claim, and he is not entitled to qualified immunity because the law with respecting to conducting a search directly after an illegal seizure is clearly established.

### 2.  Count III: Malicious Prosecution (against Officer Subers and Chief McGoldrick)

To make out his state law claim of malicious prosecution, Mr. Arditi must show that (1) Defendants initiated criminal proceedings, (2) the criminal proceeding ended in Mr. Arditi's favor, (3) the proceeding was initiated without probable cause, and (4) Defendants acted maliciously or for a purpose other than bringing Mr. Arditi to justice.  *See Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 791 (3d Cir. 2000).  The parties agree that prong 2 is satisfied

and that Officer Subers initiated the proceedings against Mr. Arditi by issuing a citation.  There does not appear to be any evidence, however, that Chief McGoldrick had anything to do with initiating the proceeding.  To connect Chief McGoldrick to the citation, Mr. Arditi relies primarily upon the fact that the citation was issued after he complained to Chief McGoldrick about his treatment at the hands of the other officers, but there is no evidence that the two Defendants communicated about Mr. Arditi before the citation was issued, and Officer Subers's report, completed before Mr. Arditi spoke with Chief McGoldrick, stated that a citation would be issued.  Therefore, the malicious prosecution claim against Chief McGoldrick will be dismissed.

Moving to probable cause, Mr. Arditi has not shown that probable cause was lacking. Mr. Arditi admits that he was involved in some kind of confrontation at the McDonald's. Disorderly conduct under Pennsylvania law only requires that a person "with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, []: (1) Engages in fighting or threatening, or in violent or tumultuous behavior; (2) Makes unreasonable noise; (3) Uses obscene language, or makes an obscene gesture; or (4) Creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor."  18 Pa. C.S. § 5503(a).  Although Mr. Arditi claims that Officer Subers did not speak with anyone in the McDonald's, he has presented no evidence contradicting Officer Subers's assertion that he spoke with other customers and employees and was told that Mr. Arditi engaged in a disruptive shouting match with another customer.  Whether Mr. Arditi actually *did* engage in disorderly conduct does not matter for probable cause purposes; what matters is whether Officer Subers reasonably believed that probable cause existed.

Mr. Arditi also tries to argue that Officer Subers has not shown that the people in McDonald's were "annoyed, inconvenienced, or alarmed," but the most he can point to in

support of that assertion is that Officer Subers admitted in his deposition that the people he interviewed did not use those exact words to describe the situation. Thus, unlike the officers in the parking lot who arguably did not have the benefit of any eyewitness information, Officer Subers did have knowledge from which he reasonably could believe there was probable cause to issue a citation for disorderly conduct. For these reasons, the Court will grant the Brookhaven motion as to Count III.

### 3.   Count IV: Conspiracy (against Officer Subers and Chief McGoldrick)

Count IV is styled as a § 1983 conspiracy claim against Officer Subers and Chief McGoldrick. Because Mr. Arditi has not shown that either of them is liable for any § 1983 violation or even for state law malicious prosecution, this claim cannot stand. Thus, the Court will grant the Brookhaven motion as to Count IV.

### B.   Officer Naegele

Officer Naegele seeks summary judgment on both the excessive force claim and the illegal search and seizure claim. He argues that his only involvement in the McDonald's parking lot confrontation was holding Mr. Arditi's arm while Officer Clymer handcuffed Mr. Arditi after Mr. Arditi refused to identify himself. He did not search Mr. Arditi's car or otherwise physically interact with him at the scene. Although Mr. Arditi claims the handcuffs were applied too tightly, he does not claim that he was in any other way physically assaulted, so there is no allegation that Officer Naegele held Mr. Arditi's arm too tightly or otherwise injured him.

Mr. Arditi counters that Officer Naegele assisted in handcuffing him and that he is therefore liable if the handcuffing was an excessive use of force. He alleges that Officer Naegele, by virtue of his presence and assistance with the handcuffing, also conspired to

unlawfully search his vehicle and is therefore liable for any unlawful intrusion on that score, as well.

Because the Court has already concluded that the handcuffing in this case did not amount to excessive force and there is no evidence that Officer Naegele did anything other than hold Mr. Arditi's arm, the excessive force claim against Officer Naegele fails. With respect to the search of Mr. Arditi's car, there is no evidence that Officer Naegele participated in the search in any way, or that he even communicated with Officer Clymer about conducting such a search. Thus, despite Mr. Arditi's arguments that Officer Naegele conspired to commit the search, there is no *evidence* that he did so. The Court will therefore grant Officer Naegele's motion with respect to the excessive force and illegal search claims.

However, Officer Naegele does not directly address Mr. Arditi's illegal seizure claim as it relates to whether Mr. Arditi should have been handcuffed at all. Such an omission is curious, in that he does not dispute that he held Mr. Arditi's arm, assisting Officer Clymer in applying handcuffs. Officer Naegele does not even mention the issue of needing probable cause or reasonable suspicion to detain and/or arrest Mr. Arditi. Officer Naegele does argue in his reply that there is no evidence that the officers conspired with each other to violate Mr. Arditi's rights,[6] but at no time does he acknowledge that simply handcuffing Mr. Arditi could constitute a Fourth Amendment illegal seizure violation under the facts of this case, let alone raise an argument about it. Indeed, Officer Naegele, even in his reply brief, continues to ignore that there is a dispute of fact as to whether Mr. Arditi resisted the handcuffing. Without any arguments directly attacking the illegal seizure claim, and with evidence that at least arguably demonstrates

---

[6] In his reply brief, Officer Naegele sets out the standard for a conspiracy claim under § 1985(3). While Mr. Arditi originally did include such a claim in his Complaint, his Third Amended Complaint contained no such claim. Thus, the Court will not address any arguments regarding discriminatory animus, which is required to prove a conspiracy under § 1985(3), but is not required to show a § 1983 conspiracy.

Officer Naegele's involvement,[7] the Court will not grant Officer Naegele's motion as to the illegal seizure claim.

### C.  Officer Young

Officer Young also moves for summary judgment against Mr. Arditi.  First, he argues that there is no evidence that he used excessive force against Mr. Arditi.  Officer Young also argues that the record shows that he was in no way involved in any search of Mr. Arditi or his vehicle, but ignores Mr. Arditi's illegal seizure claim.  Finally, Officer Young argues that Mr. Arditi is not entitled to punitive damages.[8]  The Court will discuss each claim in turn.

### 1.  Excessive Force

Officer Young claims that Mr. Arditi identified a "plainclothes, long-haired, twenty-two year old, 6'2" slender male" as having pointed a rifle at him, and that Officer Young is a "uniformed, short-haired, fifty year old, 5'10" 225 lb. former marine."  However, although Officer Young did not recall it, other officers have testified that Officer Young did take out his taser and was the only officer to unholster a weapon.  Looking at the record in the light most

---

[7] At oral argument on the motions, the topic of reasonable reliance on a fellow officer was raised. However, neither Officer Young nor Officer Naegele briefed the issue, and there are disputes of fact that would at least allow a question as to whether those assisting officers were entitled to rely on Officer Clymer's judgment.  According to Mr. Arditi, all of the officers pulled in to the parking lot at the same time and then immediately approached him without conducting an investigation.  Whether it would have been reasonable under that set of facts for Officer Naegele or Officer Young to assume that Officer Clymer had sufficient justification to then handcuff Mr. Arditi is an open question.

[8] Officer Young also alleges that Mr. Arditi's punitive damages claim must fail, and he may ultimately be vindicated on this point, as there is nothing particularly shocking about this case—to the extent there were violations of rights, they were not so outrageous as alleged as to shock the conscience.  However, the status of the punitive damatges claim is discussed below.

favorable to Mr. Arditi, Officer Young took out his taser,[9] pointed it at Mr. Arditi, and

threatened to use it on him.

Whether Officer Young's threat to use a taser on Mr. Arditi was excessive is a close

question. To answer it, the Court will look at the factors identified in *Graham v. Connor*, 490

U.S. 386 (1989) and *Sharrar v. Felsing*, 128 F.3d 810 (3d Cir. 1997):

> [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to
> the safety of the officers or others, [3] whether he actively is resisting arrest or attempting
> to evade arrest by flight[, 4] the possibility that the persons subject to the police action
> are violent or dangerous, [5] the duration of the action, [6] whether the action takes place
> in the context of effecting an arrest, [7] the possibility that the suspect may be armed, and
> [8] the number of persons with whom the police officers must contend at one time.

*Kopec*, 361 F.3d at 776–77 (citing *Graham*, 490 U.S. at 396; *Sharrar*, 128 F.3d at 822). The

*Sharrar* court also included the issue of whether the force led to physical injury as a relevant

factor.

Here, most of the factors weigh against Officer Young. The crime at issue was disorderly

conduct, a minor offense, and as has already been discussed, although the officers knew that

someone had been reported as engaging in disorderly conduct, they arguably did not have any

information linking Mr. Arditi to that crime when they approached him. As to whether Mr.

Arditi posed an immediate threat to the safety of the officers, no one has pointed to evidence that

Mr. Arditi was in any way threatening or in possession of a weapon. Officer Young notes that

Mr. Arditi testified that he was a martial arts expert, but he does not connect that extraneous fact

with the incident – that is not a fact that, if true, the officers claimed to have known at the scene.

Officer Young argues that Mr. Arditi was resisting arrest, but Mr. Arditi clearly testifies that he

was not physically resisting, although he did admit that he was not cooperating and was not

---

[9] While Mr. Arditi did say at his deposition that he initially thought an officer pointed a gun at him, at
other points in his deposition, he explained that he was told that the weapon was a taser at the time of the
confrontation. *See* May 17, 2016 Arditi Deposition, Young Mot., Ex. B, 79:4-16.

answering the officers' questions.  There is no indication that Mr. Arditi could be seen as dangerous or violent – the 911 call was about a verbal altercation.  Arguably, Officer Young took out his taser while Officer Clymer was arresting or at least detaining Mr. Arditi, but as has been thoroughly discussed, that arrest or detention may have itself violated Mr. Arditi's rights. Although Officer Young characterizes the situation as five officers dealing with three subjects (Mr. Arditi, Ms. Herbert, and Mr. Page (who was really only a bystander)), during the parking lot confrontation, there were at least three (if not four) officers addressing one subject.

The only factors that clearly weigh in Officer Young's favor are that the encounter was relatively short and there was no physical injury to Mr. Arditi resulting from Officer Young's threat of using a taser.  However, even with the majority of factors weighing against Officer Young, the two factors in his favor carry a good deal of weight.  The use of force complained of here was minor – for a short time, Officer Young threatened to use, but did not actually use, a taser, and Mr. Arditi suffered no physical injuries as a result of Officer Young's actions.

To argue that his use of force was reasonable, Officer Young relies on cases in which a suspect was actively resisting arrest or the crimes at issue were much more serious.  *See, e.g., Sharrar,* 128 F.3d at 822 (holding that pointing weapons, including machine guns, at four men suspected of drug crimes and violence was not a constitutional violation, although the force used was "more akin to the Rambo-type behavior associated with police in overdramatized B movies or TV shows"); *Pollarine v. Boyer*, 232 Fed. App'x. 106, 108 (3d Cir. 2007) (threat of pepper spray was reasonable when suspect was actively resisting arrest).  Those cases are easily distinguishable here, considering that Mr. Arditi's alleged crime was minor, and that although the officers testify to Mr. Arditi's resistance, Mr. Arditi's conflicting testimony creates a genuine issue of material fact as to whether he resisted.

The parties' lack of relevant case citations is not surprising. There do not appear to be any Third Circuit Court of Appeals cases, or cases from other courts of appeals, governing when the *threat* of a taser, as opposed to the *use* of a taser, is excessive force, whether the suspect is resisting or not. Indeed, our Court of Appeals has not outlined clearly the circumstances under which pointing a weapon of any kind at someone is excessive, and cases from this and other circuits addressing the issue of whether pointing a weapon at someone is an excessive use of force have done so under very different factual circumstances from those here. *See, e.g., Motley v. Parks,* 432 F.3d 1072, 1089 (9th Cir. 2005) (en banc) (finding excessive force where an officer pointed a firearm at an infant during a sweep of a gang member's house); *Holland v. Harrington,* 268 F.3d 1179, 1192–93 (10th Cir. 2001) (finding excessive force where officers "continu[ed] to hold the children directly at gunpoint after the officers had gained complete control of the situation"); *Courson v. McMillian,* 939 F.2d 1479, 1483–84, 1496 (11th Cir. 1991) (use of force was reasonable when a lone officer surrounded by three belligerent suspects displayed his weapon); *Black v Stephens*, 662 F.2d 181 (3d Cir. 1981) (upholding jury verdict finding excessive force when a plainclothes police officer threatened a driver with a gun, pointing the weapon directly at the driver about 18 inches from his head and with the driver's wife also in the direct line of fire, after the parties had argued about an alleged traffic infraction).

In sum, appellate cases in which pointing a weapon is deemed excessive involve considerably more egregious abuses than those alleged here, and appellate cases in which pointing a weapon is found to be reasonable involve much more dangerous crimes, suspects, and/or overall circumstances. Given this lack of clear precedent covering this situation, even if the Court were to determine that Mr. Arditi's rights were violated, Officer Young is entitled to qualified immunity because the law on threatening a potential suspect with a taser was not

clearly established at the time of the interactions at issue here.  *See Estep v. Mackey*, 639 Fed.

App'x. 870, 873-74, n.4 (3d Cir. 2016) (noting that for a right "to be clearly established, [a court]

must conclude that the firmly settled state of the law, established by a forceful body of

persuasive precedent, would place a reasonable official on notice that his actions obviously

violated a clearly established constitutional right" and that the Third Circuit Court of Appeals

"has not yet spoken in a precedential opinion about taser use" (let alone the threat of taser use)).

Therefore, the Court will grant Officer Young's summary judgment motion with respect to Mr.

Arditi's excessive force claim against him.

### 2.  Illegal Search and Seizure

Moving on to the illegal search and seizure claim, Mr. Arditi has not pointed to evidence

that Officer Young continued to threaten him with a taser after he was handcuffed, let alone that

Officer Young directly participated in the search of his vehicle.  Thus, the illegal search portion

of the claim against Officer Young must fail.

As to the illegal seizure of Mr. Arditi's person, threatening taser use can be seen as

assisting Officer Clymer with handcuffing Mr. Arditi, just as Officer Naegele's assistance of

Officer Clymer by holding Mr. Arditi's arm implicated him in the illegal seizure.  Indeed,

Officer Young justifies his unholstered taser as necessary to assist Officer Clymer to get a

struggling suspect under control.  Just like Officer Naegele, Officer Young fails to address his

involvement in this potentially illegal seizure at all in his motion.  And in the absence of any

legal argument, the Court will not dismiss the claim against Officer Young.

### 3.  Punitive damages

Officer Young argues that even if any of Mr. Arditi's claims survive summary judgment,

his claim for punitive damages should be dismissed.  "[U]nder § 1983 [a jury may award

punitive damages] when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade,* 461 U.S. 30, 56 (1983).  Punitive damages are to be "reserved for special circumstances," that is, for "cases in which the defendant's conduct amounts to something more than a bare violation justifying damages or injunctive relief." *Brennan v. Norton,* 350 F.3d 399, 428-29 (3d Cir. 2003).  Here, however, the remaining claim against Officer Young involves assisting in the handcuffing of a man who the officers arguably had no reasonable suspicion or probable cause to detain or arrest.  If a jury finds Mr. Arditi's account credible, then it is at least possible that they could find that Officer Young acted intentionally to deprive Mr. Arditi of his Fourth Amendment rights or with reckless indifference to Mr. Arditi's rights.  Indeed, the officers' mental states – that is, what they knew when Mr. Arditi was being handcuffed – are the key issues of disputed fact in this case.  Thus, the Court can not dismiss the punitive damages claim at this time.

## CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part the Motions for Summary Judgment.  An appropriate order follows.

BY THE COURT:


S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge